**No. 14-1404**

# In the United States Court of Appeals
# for the Federal Circuit

NETAIRUS TECHNOLOGIES, LLC

*Plaintiff-Appellant,*

— v. —

APPLE INC.

*Defendant-Appellee*

————————————

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
CASE NO. 2:10-CV-03257-JKA-E
HON. JOHN A. KRONSTADT

————————————

## ANSWERING BRIEF OF DEFENDANT-APPELLEE APPLE INC.

————————————

Mark C. Scarsi
Christopher J. Gaspar
Ashlee N. Lin
MILBANK TWEED HADLEY &
  MCCLOY LLP
601 South Figueroa Street
30th Floor
Los Angeles, CA 90017

Mark S. Davies
T. Vann Pearce, Jr.
Katherine M. Kopp
ORRICK, HERRINGTON &
  SUTCLIFFE LLP
1152 15th Street NW
Washington, DC 20005
(202) 339-8400

*Attorneys for Defendant-Appellee Apple Inc.*

# CERTIFICATE OF INTEREST

Counsel for defendant-appellee certifies the following:

1.    We represent Apple Inc.

2.    The name of the real party in interest (if the party named in the caption is not the real party in interest) represented: Apple Inc.

3.    Apple Inc. has no parent entity and no publicly held entity owns 10 percent or more of Apple Inc.'s stock.

4.    The following law firms and partners or associates appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

ORRICK, HERRINGTON SUTCLIFFE LLP:

Mark S. Davies
T. Vann Pearce, Jr.
Katherine M. Kopp

MILBANK TWEED HADLEY AND MCLOY LLP

Mark C. Scarsi
Christopher J. Gaspar
Ashlee N. Lin
Chris L. Holm*
Hannah L. Cannom*
Caitlin K. Hawks*

* - Attorney no longer with firm

Date: August 12, 2014
Respectfully submitted,

By: */s/ Mark S. Davies*
Mark S. Davies
ORRICK, HERRINGTON &
    SUTCLIFFE LLP
1152 15th Street
Washington, D.C. 20005
mark.davies@orrick.com

*Attorney for Defendant-Appellee
Apple Inc.*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES .......................................................................... v

STATEMENT OF RELATED CASES ........................................................ x

INTRODUCTION ........................................................................................ 1

STATEMENT OF THE ISSUES ................................................................ 3

STATEMENT OF THE CASE ................................................................... 4

    Patent Office Proceedings .................................................................. 4

    District Court Proceedings ............................................................... 14

SUMMARY OF THE ARGUMENT ......................................................... 22

STANDARD OF REVIEW ........................................................................ 24

ARGUMENT ............................................................................................... 25

I.    THE CLAIMS ARE INVALID BECAUSE THE "TRANSMIT
    POWER LEVEL," "E-MAIL," AND "PDA" CLAIM
    ELEMENTS ARE NOT DESCRIBED IN THE PATENT ............. 25

    A.    The 1997 Application Describes a Notebook
        Computer System with a Conventional Cellular
        Telephone Handset ............................................................... 27

        1.    The 1997 Application did not disclose a handset
            that can selectively communicate at high and low
            power ........................................................................... 28

        2.    The 1997 Application did not disclose a handset
            that can send and receive e-mail ................................. 30

        3.    The 1997 Application did not disclose a handset
            that contains PDA functionality ................................. 33

    B.    NetAirus Has Not Shown any Error ..................................... 35

        1.    The district court properly instructed the jury on
            the law of written description ..................................... 36

        2.    Apple's closing argument on written description
            was proper and did not undermine the jury
            instructions ................................................................. 39

3.   The district court's response to the jury question was correct and did not undermine the jury instructions ................................................. 42

4.   NetAirus's remaining complaints related to the written description jury verdict are meritless ............ 47

II.   THE CLAIMED INVENTIONS WERE OBVIOUS IN LIGHT OF THE HANDSETS DESCRIBED IN PRINTED PUBLICATIONS AND THE GSM STANDARD .......................... 52

A.   The Claimed Invention Is Obvious in Light of the Devices Described in *The San Francisco Chronicle* and *Byte Magazine* and the GSM Standard ....................... 53

B.   There Was Ample Motivation to Combine the GSM Standard with the Devices Described in The *San Francisco Chronicle and Byte Magazine* .............................. 56

C.   The GSM Standard Taught "Selective" Communication ................................................... 59

III.   NETAIRUS DID NOT PROVIDE SUFFICIENT EVIDENCE OF INFRINGEMENT ................................................. 64

A.   NetAirus Did Not Prove that Apple Practiced the "Transmit Power Level" Element ........................................ 64

B.   The District Court Properly Declined to Give NetAirus's Redundant Jury Instruction .............................. 73

CONCLUSION ...................................................... 77

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*Abbvie Deutschland GmbH & Co., v. Janssen Biotech, Inc.,*
__ F.3d __, Nos. 2013-1338, 1346, 2014 WL 2937477 (Fed. Cir.
Jul. 1, 2014) ..................................................................................51

*ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.,*
694 F.3d 1312 (Fed. Cir. 2012) ...................................................58, 59

*ADC Telecomms., Inc. v. Switchcraft, Inc.,*
281 F. App'x 989 (Fed. Cir. 2008) ........................................................24

*Alcon Research Ltd. v. Barr Labs., Inc.,*
745 F.3d 1180 (Fed. Cir. 2014) ..........................................................50

*Alza Corp. v. Mylan Labs, Inc.,*
464 F.3d 1286 (Fed. Cir. 2006) ..........................................................55

*Amsted Indus. Inc. v. Buckeye Steel Castings Co.,*
24 F.3d 178 (Fed. Cir. 1994) .............................................................71

*Ariad Pharms., Inc. v. Eli Lilly & Co.,*
598 F.3d 1336 (Fed. Cir. 2010) ........................................25, 37, 40, 49

*Bard Peripheral Vascular, Inc. v. W.L. Gore & Assocs., Inc.,*
670 F.3d 1171 (Fed. Cir. 2012), *aff'd in relevant part*, 682 F.3d
1003 ..........................................................................................51

*Beckman Instruments, Inc. v. LKB Produkter AB,*
892 F.2d 1547 (Fed. Cir. 1989) ...................................................41, 48

*Biodex v. Loredan Biomedical, Inc.,*
946 F.2d 850 (Fed. Cir. 1991) .....................................................37, 39

*Bird v. Glacier Elec. Coop., Inc.,*
255 F.3d 1136 (9th Cir. 2001) ...........................................................42

*Brown & Williamson Tobacco Corp. v. Phillip Morris Inc.,*
229 F.3d 1120 (Fed. Cir. 2000) .......................................................... 57

*Cordance Corp v. Amazon.com, Inc.,*
658 F.3d 1330 (Fed. Cir. 2011) .......................................................... 26

*CytoLogix Corp. v. Ventana Med. Sys., Inc.,*
424 F.3d 1168 (Fed. Cir. 2005) .......................................................... 50

*Don Burton, Inc. v. Aetna Life & Cas. Co.,*
575 F.2d 702 (9th Cir. 1978) .............................................................. 74

*Duran v. City of Maywood,*
221 F.3d 1127 (9th Cir. 2000) ....................................................... 37, 44

*ePlus, Inc. v. Lawson Software, Inc.,*
700 F.3d 509 (Fed. Cir. 2012) ............................................................ 71

*Gracie v. Gracie,*
217 F.3d 1060 (9th Cir. 2000) ............................................................ 76

*Graham v. John Deere Co.,*
383 U.S. 1 (1986) ................................................................................ 55

*Guy v. City of San Diego,*
608 F.3d 582 (9th Cir. 2010) .............................................................. 25

*Image Tech. Servs., Inc. v. Eastman Kodak Co.,*
125 F.3d 1195 (9th Cir. 1997) ....................................................... 39, 46

*Integra Lifesciences I, Ltd. v. Merck KGaA,*
496 F.3d 1334 (Fed. Cir. 2007) .......................................................... 49

*InTouch Techs., Inc. v. VGO Commc'ns, Inc.,*
751 F.3d 1327 (Fed. Cir. 2014) .......................................................... 58

*Jones v. Williams,*
297 F.3d 930 (9th Cir. 2002) .............................................................. 44

*In re Keller,*
613 F.2d 819 (C.C.P.A. 1980) ............................................................ 44

*Kinetic Concepts, Inc. v. Smith & Nephew, Inc.*,
    688 F.3d 1342 (Fed. Cir. 2012) .................................................. 24, 55

*KSR Int'l Co. v. Teleflex Inc.*,
    550 U.S. 398 (2007) ............................................................................ 55

*Lazare Kaplan Int'l, Inc. v. Photoscribe Techs., Inc.*,
    628 F.3d 1359 (Fed. Cir. 2010) .......................................................... 67

*Liebel-Flarsheim Co. v. Medrad, Inc.*,
    358 F.3d 898 (Fed. Cir. 2004) ............................................................ 40

*Maix v. Virani*,
    253 F.3d 641 (11th Cir. 2001) ............................................................ 48

*Mirror Worlds, LLC v. Apple Inc.*,
    692 F.3d 1351 (Fed. Cir. 2012) .......................................................... 71

*Norian Corp. v. Stryker Corp.*,
    363 F.3d 1321 (Fed. Cir. 2004) .......................................................... 58

*Novartis Pharms. Corp. v. Abbott Labs.*,
    375 F.3d 1328 (Fed. Cir. 2004) .......................................................... 63

*Optivus Tech., Inc. v. Ion Beam Applications S.A.*,
    469 F.3d 978 (Fed. Cir. 2006) ............................................................ 58

*Palmer v. Hoffman*,
    318 U.S. 109 (1943) ............................................................................ 36

*Paper Converting Mach. Co. v. Magna-Graphics Corp.*,
    745 F.2d 11 (Fed. Cir. 1984) .............................................................. 75

*PIN/NIP, Inc. v. Platte Chem. Co.*,
    304 F.3d 1235 (Fed. Cir. 2002) .......................................................... 26

*PowerOasis, Inc. v. T-Mobile USA, Inc.*,
    522 F.3d 1299 (Fed. Cir. 2008) .......................................................... 26

*Schneider v. Strote*,
    51 F. App'x 239 (9th Cir. 2002) ........................................................ 36

*Servs. Emps. Int'l Union v. Nat'l Union of Healthcare Workers*,
    711 F.3d 970 (9th Cir. 2013) ........................................... 3, 25

*St. Clair Intellectual Prop. Consultants, Inc. v. Canon Inc.*,
    412 F. App'x 270 (Fed. Cir. 2011) ..................................... 26

*Synthes USA, LLC v. Spinal Kinetics Inc.*,
    734 F.3d 1332 (Fed. Cir. 2013) ........................................ 24

*Tronzo v. Biomet, Inc.*,
    156 F.3d 1154 (Fed. Cir. 1998) ........................................ 35

*United States v. Redlightning*,
    624 F.3d 1090 (9th Cir. 2010) ......................................... 39

*Van Buskirk v. Baldwin*,
    265 F.3d 1080 (9th Cir. 2001) ......................................... 48

*Van Cleef v. Aeroflex Corp.*,
    657 F.2d 1094 (9th Cir. 1981) ......................................... 75

*Verizon Servs. Corp. v. Cox Fibernet Va., Inc.*,
    602 F.3d 1325 (Fed. Cir. 2010) ..................................... 25, 63

*Welker Bearing Co. v. PHD, Inc.*,
    550 F.3d 1090 (Fed. Cir. 2008) ........................................ 72

*White v. Ford Motor Co.*,
    312 F.3d 998 (9th Cir. 2002) ........................................... 2

*Wordtech Sys., Inc. v. Integrated Networks Solutions, Inc.*,
    609 F.3d 1308 (Fed. Cir. 2010) ........................................ 46

**FEDERAL STATUTES**

35 U.S.C. § 102 ........................................................ 53

35 U.S.C. § 102(b) ..................................................... 53

35 U.S.C. § 103 ......................................................... 3

35 U.S.C. § 103(a) ..................................................... 53

35 U.S.C. § 112 ...................................................................... 10

35 U.S.C. § 112(a) ................................................................... 3

35 U.S.C. § 112 ¶ 1 ............................................................... 25

35 U.S.C. § 271(a) ............................................................ 4, 64

35 U.S.C. § 302 ...................................................................... 13

## FEDERAL RULES AND REGULATIONS

Fed. R. Civ. P. 51(c)(1) .......................................................... 35

## OTHER AUTHORITIES

Lev Grossman, "Invention of the Year: The iPhone,"
    *Time* (Nov. 1, 2007) *available at*
    http://content.time.com/time/specials/2007/article/0,28804,1677
    329_1678542_1677891,00.html (last accessed June 4, 2014) ........... 14

*Model Patent Jury Instructions for the N.D. Cal.* § 4.2a (Nov. 3,
    2011) *available at* http://tinyurl.com/ka5rzqw. .................................. 37

9C Charles Alan Wright & Arthur R. Miller, 9C *Fed. Prac. & Proc.
    Civ.* § 2554 (3d ed.) ............................................................. 36

## STATEMENT OF RELATED CASES

No other appeal involving this civil action was previously before this or any other appellate court.

*NetAirus Technologies, LLC v. Apple Inc.*, Central District of California case number 2-13-cv-3780, involves the same parties and same patent at issue here.  The case is stayed pending this appeal.

## INTRODUCTION

This case is an example of our patent litigation system functioning as it should.  Apple Inc. invented a popular smartphone, the iPhone, and a few years later was sued by NetAirus Technologies, LLC based on a patent that describes a notebook computer system with a conventional cellular handset.  After a series of pretrial rulings and a six-day trial, the case was submitted to a jury.  The jurors actively sought further guidance throughout the deliberation process, beginning by requesting additional copies of the patent.  A13,303.  They submitted four questions seeking precise definitions of claim terms, clarity regarding aspects of the verdict form, and a nuanced understanding of the "written description" doctrine.  A13,323, 13,325, 13,327, 13,330, 13,331. After the jury indicated that it could not reach a unanimous verdict, Apple and NetAirus agreed to accept a majority verdict.  A1576.  The jury returned a verdict in Apple's favor on all issues.  A3-7.

Thereafter, the district court issued a single-spaced 24-page order explaining why it was denying NetAirus's motion for new trial and renewed motion for judgment as a matter of law.  A8-31.  "After a thorough examination of all the relevant evidence at trial," the court

ruled that "the original application does not provide written description support for" an advanced handset. A26. The district court then concluded that the evidence of obviousness was substantial, noting the detailed testimony about the prior art publications that disclosed handsets with the same functions claimed here. A20-21. And the court declined to disturb the jury's noninfringement ruling, both because NetAirus failed to show that Apple used an iPhone 4 to perform a claim element ("selectively" transmitting at higher and lower power levels) and because "the jury was entitled to give little weight to" NetAirus's inconsistent expert. A14-16.

Given this Court's role and the high quality of the proceedings below, this Court's task is straightforward. Almost all the issues raised by NetAirus are subject to the "substantial evidence" standard, which requires the Court to uphold the jury verdict unless "the evidence, construed in the light most favorable to [Apple], permits only one reasonable conclusion, and that conclusion is contrary to that of the jury." *White v. Ford Motor Co.*, 312 F.3d 998, 1010 (9th Cir. 2002) (internal quotation marks omitted). NetAirus also questions two jury instructions; those issues invoke the similarly deferential "abuse of

discretion" standard. *Servs. Emps. Int'l Union v. Nat'l Union of Healthcare Workers*, 711 F.3d 970, 981 (9th Cir. 2013) (citation omitted). As we detail below, the "diligent" (A26) jury and careful district court rulings are correct on the merits. This Court should affirm.

## STATEMENT OF THE ISSUES

1.    The jury found the asserted patent claims invalid because the specification did not "contain a written description of the invention." 35 U.S.C. § 112(a). Does substantial evidence support the jury verdict where the specification describes a conventional cellular handset but the asserted claims refer to a handset that: communicates selectively at high and low power; sends and receives e-mail; and is configured as a personal digital assistant ("PDA")?

2.    The jury found the asserted patent invalid because it "would have been obvious" to one skilled in the art. 35 U.S.C. § 103. Does substantial evidence support the jury verdict where the prior art publications taught every claim element and there was unrefuted evidence of motivation to combine the publications?

3.    The jury found the asserted method patent not infringed by Apple's accused products.  35 U.S.C. § 271(a).  Does substantial evidence support the jury verdict where NetAirus presented no evidence that any Apple product had performed all the steps of the claimed method?

## STATEMENT OF THE CASE

This case began with a 1997 patent application for a "modular notebook-like computer system" with a "conventional handset," took a U-turn when pending claims were amended to cover advanced handset features, and effectively ended, after a series of pretrial rulings, with a jury deciding that the issued patent is invalid and was not infringed.

### Patent Office Proceedings

*1997 Application.*  In April 1997, Richard Ditzik filed a patent application for "Modular Notebook and PDA Computer Systems for Personal Computing and Wireless Communications" (the "1997 Application").  A6025.  The 1997 Application begins by noting a market need:  "Many customers require functionality of a desktop computer, notebook computer and PDA, but it is much too expensive to purchase multiple CPUs, displays, and keyboards."  *Id.*; A236 (U.S. Patent

7,103,380 (the "'380 patent"), col. 1:35-38).[1]  "Inventions herein solve these problems by embodying a unique relatively thin notebook-like computer system."  A6027; A236, col. 2:12-14.  "The computer system as used herein can also be referred to as a portable computer system, computer-display unit or base unit, and shall also include the terms: personal computer, notebook computer, sub-notebook computer or Personal Digital Assistant (PDA)."  A6028; A237, col. 3:52-58.

Mr. Ditzik sought to "combin[e] in one system the capability of performing both office desktop and portable/mobile computing and communications applications," thus "sav[ing] the user the expense of purchasing separate computer systems for desktop uses, notebook computer uses, PCS uses and PDA uses."  A6027; A236, col. 2:35-42; *see also id.*, col. 2:24-28.  His system used "a relative [*sic*] large flat panel display device assembly (2), an expandable hinge device (10), battery power source (9), keyboard assembly (16), and wireless communications devices (32, 51)."  A6044; A226, Abstract; *see also* A6025; A236, col. 1:14-20.  The "relatively large" display "may be 10 to 14 inches or

---

[1] For ease of reference, we provide parallel citations to the 1997 Application and the '380 patent.

more in diameter," an "important feature" allowing the device to "carry papers from location to location without folding or wrinkling them." A6029-30; A237-38, col. 4:20-29, col. 4:62-5:8; *see also* A6033; A239, col. 7:43-8:6.

The 1997 Application also describes a "handset telephone unit" that is "roughly equivalent to a conventional cellular telephone." A6033; A239, col. 8:19-25. This "handset telephone unit," that may operate *with* the separate computer system, is shown in Figure 3(c) (alongside the computer system shown as Figure 3(a)):



(c)

(a)

Figure 3

A6047; A6028; A230; A237, col. 3:36. Here, the computer system acts as

a "base unit" to "relay" data between the handset and a wide area

communication network (e.g., a telephone network). A6027, 6031, 6034;

A236, col. 2:59-67; A238, col. 6:25-31; A239, col. 8:26-48. This allows

the handset to operate with "much lower RF transmit and receiver

electrical power levels." A6034; A239, col. 8:42-46. The nearby

computer system, rather than the handset, is "designed for a higher

transmitting power level," or to switch between high and low power levels. *Id.*, col. 8:38-42. "A very important advantage of this invention is that the user has the option of having very low electrical power electromagnetic fields near his/her's [*sic*] head, thus improving the health and safety aspects for the user." *Id.*, col. 8:52-56.

Figure 7, reproduced below, shows a "notebook unit" (highlighted in green) that communicates wirelessly with a conventional "handset unit" (highlighted in blue):



FIG. 7

Similarly, Figure 8 is a "flow diagram of the computer system programs and operations." A237, col. 3:48-49. This figure does not even show the conventional handset. It just refers (in box 81) to a "Base Unit" that communicates with a conventional "Handset/Earset":



Consistent with the focuses of the above figures, the 1997 Application's original claims were directed towards the computer system, i.e., the "notebook" or "base unit." A6087-89. Claim 1, for instance, recites "a portable computer-display unit … adapted to a

clamshell-like notebook structure for conventional computing" that a user may carry "under his/her arm" and "place relatively thin flat objects" inside. A6087. The only claims mentioning a "handset" refer to a base station that "relay[s] data between the handset means and the wide area network," as described in the specification. A6087-88.

*Changes to Pending Claims.* In 1999, Mr. Ditzik filed a divisional application (the "1999 Application") with the same title and a substantively identical specification as the 1997 Application. A6018-24. After several rounds of amendments, all pending claims were changed to cover methods of controlling *handset* units, A6204-05, and Mr. Ditzik changed the application's title to "Wireless *Handset* Communication Systems." A6151 (emphasis added).

During the subsequent prosecution, the Patent and Trademark Office ("PTO") *seven times* rejected the pending amended claims as failing to meet the "written description" requirement of 35 U.S.C. § 112. Initially, the examiner found no written description of, *inter alia*, "the 'handset' unit being 'primarily a personal digital assistant'…." A6212. Mr. Ditzik responded by arguing that portions of the application describing the "computing system" including a "PDA" "can refer to both

10

wireless handset and base unit." A6275-78 (citing Figs. 7 and 8 and accompanying text). He also further amended the claims, including adding a dependent claim "in which said handset unit is adapted to e-mail functions." A6273.

In response, the examiner maintained the rejection and further found "the instant specification fails to provide for the 'handset unit' to be adapted to 'e-mail functions' [or] 'personal productivity functions' … but at most provides for the base to." A6299-300. As to Mr. Ditzik's arguments, the examiner concluded: "[t]he method and steps recited are just not there … the specification clearly sets forth that the 'system' is a reference to the base unit/notebook computer/PDA." A6304-05. Mr. Ditzik tried time and again to overcome the written description rejections, to no avail. A6315-19, 6334, 6340-42, 6351-52, 6362-63, 6374-77, 6386.

Without explanation, the examiner eventually dropped the lack of written description rejection following an interview with Mr. Ditzik. A6395-98. But when a new examiner later took up the application, he too found "the specification fails to provide support for a handset unit configured to a PDA. … The PDA is mentioned interchangeably with a

notebook computer, not a handset." A6466-68. Mr. Ditzik overcame

this rejection by pointing to the prior examiner's apparent acceptance of

his arguments. A6480. He also submitted what he termed a

"redrawn/simplified" Figure 7, reproduced below, purporting to "show[]"

that the "specification discloses that the handset unit (14) may include

a small PDA unit … ." *Id.*



This "redrawn/simplified" Figure 7 was not part of the 1997

Application. The actual Figure 7 (reproduced above at 8) in the 1997

Application does not reference a "PDA." A6050.

In 2006, the 1999 Application issued as U.S. Patent 7,103,380 (the

"'380 patent"). A226.

*The Claims Are Amended Again After the PTAB Rules All Asserted*

*Claims Invalid.* Mr. Ditzik established NetAirus to license and enforce

the '380 patent against operating companies. A490, 578. In April 2010,

NetAirus filed suit against Apple Inc. A7801-03. Apple requested the Patent Office reexamine the issued patent. A6513. *See also* 35 U.S.C. § 302. The Patent Office ruled the claims invalid because they claimed obvious material. A6901-24.

Eventually, NetAirus overcame the rejection by, among other things, amending the claims to require that the handset be "configured to a personal digital assistant (PDA)." A7020-21, 7085-92. Claims 3, 7, and 9-12, as amended during the reexamination, are asserted here. Claim 7 is representative:

> 7. *A method for handset unit communication* comprising the following steps in any order:
>
> a) directly communicating bi-directional wireless voice and computer data including wireless data networking communicating data selectively to and from a local area base unit and an external wide area network;
>
> b) *transmitting a first wireless radio frequency (RF) signal comprising said data selectively to said local area base unit and to the external wide area network*, wherein the data is not necessarily transmitted simultaneously to the local area base unit and to the external wide area network and wherein *the first wireless RF signal transmit power level transmitted to the local area base unit is lower than the power level required to transmit the signal to the external wide area network*;

> c) receiving a second wireless RF signal comprising said data from said local area base unit;
>
> d) wherein said *handset unit data includes data formatted for e-mail*; and
>
> e) wherein said *handset unit is configured to a personal digital assistant (PDA) having PDA functions* in addition to handset unit communication functions.

A242, col. 14:21-41 (emphasis added). The emphasized claim elements in (b), (d), and (e) are referred to herein as the "transmit power level," "e-mail," and "PDA" elements, respectively.[2]

## District Court Proceedings

Among other products, Apple makes and sells the iPhone, a re-imagined smartphone with an intuitive "multi-touch" screen interface, appealing design, and ever-expanding universe of apps.[3] The NetAirus complaint accused Apple's iPhone products of infringing the '380 patent.

_____

[2] Although claims 3 and 7 are worded slightly differently, no party has contended that those differences matter. Reexamined and amended claim 3 depends from both claim 2 and cancelled claim 1. Claims 9-12 depend from reexamined and amended claim 7.

[3] *See* Lev Grossman, "Invention of the Year: The iPhone," *Time* (Nov. 1, 2007), *available at* http://content.time.com/time/specials/2007/article/0,28804,1677329_1678542_1677891,00.html (last accessed June 4, 2014).

A7805.

*Three Pretrial Rulings.*  Before trial, the district court noted a disconnect between the claims and the specification that "pose[d] a potential written description invalidity issue."  A10,140.  The court observed that the specification apparently "does not refer to" a handset configured as a PDA.  A10,137-40.  "[I]t is the computer system, not the handset, which the specification describes as running the personal productivity programs that NetAirus seeks to ascribe to the handset." A10,138.  The district court nevertheless elected to reserve adjudication of the written description issue for the jury, declining Apple's request for summary judgment.  A10,150.

The district court construed the "PDA" element added during reexamination as "designed to, or adapted to, perform the functions of a personal data assistant (PDA)," A10,128, primarily relying on Mr. Ditzik's statements during prosecution, A10,140-49.  For example, the court cited the "redrawn/simplified" Figure 7 submitted by Mr. Ditzik during prosecution, showing a "handset/PDA unit."  A10,145-46; *see supra* at 12.  The court noted, however, that this "would be more accurately called an 'altered' drawing," A10,128 n.1, because "[n]o such

[handset/PDA] label appears in the actual specification." A10,145.

The district court issued two other pretrial rulings relevant here. The court construed "selectively" as encompassing both manual and automatic selection. A8765. NetAirus argued that "selectively" required "program software contained on the handset" and did not encompass selection controlled by some entity outside the handset, such as manual selection by a human user. A14,672-74. The district court rejected NetAirus's argument. A8765. The district court also ruled that the reexamination amendments substantively changed the claims, thereby eliminating any possible infringement before the reexamination certificate issued on October 8, 2012. A10,196-97. "[T]he specification does not clearly treat the PDA and handset as identical." A10,196. "Furthermore, the PTO did not consider the amended claims with the 'configured to a PDA' limitation to be 'identical' with or 'without substantive change' from the original claims." A10,197. As a consequence, the trial concerned only the iPhone 4 products sold after the reexamination certificate (NetAirus accuses later iPhone versions and iPad products in a follow-on suit). A11,404.

*The Jury Sides with Apple.* The case proceeded to a jury trial on the issues of lack of written description, obviousness, and non-infringement. Apple explained that the "transmit power level," "PDA," and "e-mail" claim elements each lacked written description support. Apple also explained that the claimed inventions were obvious based on two independent prior art combinations. The first was an article describing the Nokia 9000 phone combined with Global System for Mobile Communications (GSM) standards documents.[4] The Nokia 9000, introduced in March 1996, incorporated "the functions of a GSM phone, a palmtop computer and an organizer, all-in-one." A7132-34. The second was a Byte Magazine article describing the IBM Simon, a phone with PDA and e-mail functions introduced in 1994, combined with the GSM standards documents. A7103-07. Apple also noted that NetAirus had not shown that any Apple product performed the claimed methods of handset communication.

Following a six-day trial, and after asking the trial court several questions, the jury returned a verdict in Apple's favor on all issues. A3-

---

[4] GSM was "an advanced form of digital telecommunications that can handle sophisticated data transactions." A5863.

7. The vote was 6-2 in favor of Apple on the written description issue and 5-3 on the issues of obviousness and direct infringement. A1589-99.

*NetAirus's Post-Trial Motions Are Denied.* NetAirus sought to overturn the jury verdict (other than on indirect infringement) through motions for judgment as a matter of law ("JMOL") and a new trial. After a hearing, the district court issued a careful and thorough opinion denying these motions. A8-31.

First, the court declined to disturb the jury's written description ruling. "After a thorough examination of all the relevant evidence at trial, it appears that the original application does not provide written description support for a handset that is a PDA or a handset that can send email." A26; *see also* A29-30 (citing the testimony of Dr. Jeffrey Rodriguez, Apple's expert, at A1090-93, 1099, 1101, 1104).[5] NetAirus's expert, Mr. Blackburn, admitted that after reading the '380 patent many times, "he was unable to point to anything in the specification

---

[5] Dr. Jeffrey Rodriguez is a professor of Electrical and Computer Engineering at the University of Arizona since 1990 and a senior member of the Institute of Electrical and Electronics Engineers. A1078-87. He was accepted as an expert without objection. A1087.

that supported sending e-mail from the handset." A28 (citing A1294-95). His trial testimony that Figure 8 provided the requisite written description was "impeached with his deposition testimony that the portion of Figure 8 at issue pointed to the functionality of the base station, not the handset." *Id.* (citing A1295-96, 2508).

The district court concluded that it did not need to decide whether the original application claims provided written description support for the "transmit power level" elements, as belatedly argued by NetAirus. A24. This original application claims "theory [was] not presented through evidence or during argument." A25-27. Moreover, the "e-mail" and "PDA" arguments were "fully sufficient independent factual grounds for the jury's finding[,] unrelated to the issue of the original claims." A24; A26-30.

The court also rejected NetAirus's complaint that the written description jury instructions gave Apple room to make improper arguments. A24-25. "[A]n examination of [Apple's] statements now criticized by NetAirus—ones to which it did not object at trial—demonstrates that they properly focused on the lack of support for the asserted claims in the application as filed." A25. Rejecting NetAirus's

claim of jury confusion, the court noted: "that the jury asked several questions on a topic about which the Federal Circuit has debated and written at length, shows that they were diligent, not that they were confused." A26.

Second, the court declined to disturb the jury's obviousness ruling. The district court concluded the evidence of obviousness was substantial. A19-22. The court recounted Dr. Rodriguez's detailed testimony explaining that "the Nokia 9000 Communicator as described in a San Francisco Chronicle article" "combined with the GSM Standards" disclosed every element of every asserted claim. A20. So too, the "IBM Simon phone" described in a Byte Magazine article "combined with the GSM Standards[,]" disclosed every element of every asserted claim. A21.

Third, the court declined to disturb the jury's noninfringement ruling. NetAirus did not connect the evidence it presented showing "general patterns" of cell phone power transmissions "with Apple's performance of the other steps of the asserted claims." A17. Testimony by Dr. Rodriguez and an Apple engineer contradicted NetAirus's infringement theory. *Id*.; A12. Moreover, NetAirus presented its

20

infringement case through its expert Mr. Blackburn, but the district court recounted many reasons why "the jury was entitled to give little weight to Blackburn's trial testimony." A17. For example, Mr. Blackburn allegedly tested iPhone 4 products to show they met the "transmit power level" element, but "[t]he testing notes he produced to support the results contained in his expert report were dated after the report was submitted." A13. The district court also recounted eight separate times that Mr. Blackburn's trial testimony was impeached with inconsistent deposition testimony. A14-16.

Contrary to suggestions by NetAirus, the court explained that the jury instructions on infringement did not imply that infrequent infringement was no infringement. A18. NetAirus's proposed additional instruction on "part-time" infringement quoted irrelevant precedent and would have confused the jury given NetAirus's pursuit (at trial) of both direct and indirect infringement theories. *Id.* Moreover, NetAirus failed to object to Apple's closing argument or otherwise address supposedly misleading statements by Apple's counsel, and so it "cannot presently argue with any force that this instruction should have been used." A18-19.

Last, the district court rejected NetAirus's claim that the verdict was contrary to the clear weight of the evidence. "Apple offered percipient and expert testimony from which the jury could reasonably have made the findings that are contained in its verdict." A30.

## SUMMARY OF THE ARGUMENT

**I.**      Substantial evidence supported three independently sufficient grounds for the jury's general verdict of invalidity due to no written description. The '380 patent only describes the "transmit power level," "e-mail," and "PDA" elements as features of the notebook-like "computer system," not as features of the separate handset. Apple's expert explained this to the jury, and NetAirus's own expert witness admitted that he could find no written description support for the claims. There is no basis to disturb the jury verdict on these factual questions.

The written description jury instruction correctly and adequately covered the law. Nothing required the district court to pick NetAirus's preferred model jury instruction, and NetAirus waived any claim of prejudice by not properly objecting to either the instruction or Apple's supposedly misleading closing argument. The district court also acted

within its discretion in answering the jury's question about the written description verdict form with the parties' agreed upon response. The original application claims, which NetAirus stresses here, were never part of NetAirus's theory of the case and do not even arguably relate to two of the three independent bases for the jury's invalidity verdict.

II.   Based on the jury's factual findings, the district court correctly ruled that all asserted claims would have been obvious in light of two separate prior art combinations. NetAirus accepts the ruling except for its disagreement with two of the jury's factual findings. Neither contention has merit. Apple presented documentary evidence and testimony showing that the GSM cellular network's "adaptive power control" caused cellular handsets to communicate "selectively," as claimed in the '380 patent. NetAirus's contrary argument relies upon a narrow claim construction rejected by the district court long before trial and not contested here. Apple also presented unrebutted evidence showing motivation to combine the prior art. A21.

III.   NetAirus presented no evidence that Apple ever practiced the claimed "transmit power level" element. NetAirus did not tie the general industry-wide power probability data (its primary evidence on

this point) to any specific instance of infringement by Apple. The agreed upon jury instruction on direct infringement was accurate and the district court correctly declined NetAirus's unnecessary and confusing additional instruction.

## STANDARD OF REVIEW

When a jury rules a patent invalid due to lack of an adequate written description, this Court reviews the verdict for substantial evidence. *Synthes USA, LLC v. Spinal Kinetics Inc.*, 734 F.3d 1332, 1340-41 (Fed. Cir. 2013). When a jury rules a patent invalid due to obviousness, this Court reviews the presumed factual findings for substantial evidence and the ultimate conclusion of obviousness de novo. *Kinetic Concepts, Inc. v. Smith & Nephew, Inc.*, 688 F.3d 1342, 1356-57 (Fed. Cir. 2012). When a jury rules a patent not infringed, the Court reviews the verdict for substantial evidence. *ADC Telecomms., Inc. v. Switchcraft, Inc.*, 281 F. App'x 989, 991 (Fed. Cir. 2008). The "substantial evidence" standard requires the Court to uphold the jury verdict unless "the evidence, construed in the light most favorable to [Apple], permits only one reasonable conclusion, and that conclusion is contrary to that of the jury." *White*, 312 F.3d at 1010 (internal quotation marks omitted).

24

The Court applies regional circuit law in reviewing decisions on motions for JMOL and a new trial.  *Verizon Servs. Corp. v. Cox Fibernet Va., Inc.*, 602 F.3d 1325, 1331 (Fed. Cir. 2010).  The Ninth Circuit reviews denials of JMOL without deference.  *White*, 312 F.3d at 1010.  The Ninth Circuit reviews denials of motions for a new trial for abuse of discretion.  *Guy v. City of San Diego*, 608 F.3d 582, 585 (9th Cir. 2010).  A jury instruction is reviewed "de novo for statements of law and under abuse of discretion for its formulation."  *Servs. Emps. Int'l Union v. Nat'l Union of Healthcare Workers*, 711 F.3d 970, 981 (9th Cir. 2013) (citation omitted).

## ARGUMENT

## I.    THE CLAIMS ARE INVALID BECAUSE THE "TRANSMIT POWER LEVEL," "E-MAIL," AND "PDA" CLAIM ELEMENTS ARE NOT DESCRIBED IN THE PATENT

To satisfy 35 U.S.C. § 112 ¶ 1, a patent's specification "must clearly allow persons of ordinary skill in the art to recognize that [the inventor] invented what is claimed … as of the filing date."  *Ariad Pharms., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1351 (Fed. Cir. 2010) (en banc) (internal quotation marks omitted).  This "written description" requirement exists "to ensure fair play in the presentation of claims

after the original filing date and to guard against manipulation of that process by the patent applicant." *PowerOasis, Inc. v. T-Mobile USA, Inc.*, 522 F.3d 1299, 1306 (Fed. Cir. 2008) (citations omitted).

Mr. Ditzik amended his claims to cover inventions not described in his 1997 Application. The Patent Office's repeated rejections for lack of written description are consistent with the jury's decision to reject the same claims. *See St. Clair Intellectual Prop. Consultants, Inc. v. Canon Inc.*, 412 F. App'x 270, 276 (Fed. Cir. 2011) (patent examiner "can be considered one of ordinary skill in the art"). Apple proved that three claim elements lacked written description support, and the general jury invalidity verdict must stand if any of these three alternative arguments is supported by substantial evidence. *See Cordance Corp v. Amazon.com, Inc.*, 658 F.3d 1330, 1339 (Fed. Cir. 2011); *PIN/NIP, Inc. v. Platte Chem. Co.*, 304 F.3d 1235, 1247-48 (Fed. Cir. 2002) (inadequate written description for any element invalidates the claim). None of NetAirus's contentions change these facts or justify retrial.

### A.    The 1997 Application Describes a Notebook Computer System with a Conventional Cellular Telephone Handset

The 1997 Application describes a notebook computer with a conventional cellular handset.  The application refers to a "relatively thin notebook-like *computer system*," A6027 (emphasis added); A236, col. 2:12-14, using "a relative [*sic*] large flat panel display device assembly (2), an expandable hinge device (10), battery power source (9), keyboard assembly (16), and wireless communications devices (32, 51)." A6044; A226, Abstract; *see also* A6025; A236, col. 1:14-20.  For this reason, the 1997 Application's claims were directed towards the "notebook" or "base unit." A6087-89.  Although the 1997 Application also refers to a "handset telephone unit," the handset unit was a "conventional cellular telephone" circa 1997.  A6033; A239, col. 8:19-25. A "handset" is not one of the terms the patent uses as synonymous with "computer system."  A237, col. 3:52-58; *see also* A30, Fig. 3.  And, other than noting it requires "less power" than the conventional handset, the 1997 Application never describes the handset as having any functionality besides transmitting and receiving data as a "conventional cellular telephone," A6033; A239, col. 8:19-25; col. 8:53-59.

The amended claims asserted here are invalid because the written description of the patent does not teach three elements. Even though the application was for a notebook computer, the asserted claims refer to (1) a "handset" that "selectively" transmits to a local base unit at a power level that "is lower than the power level required to transmit the signal to the external wide area network"; (2) "handset unit data" that "includes data formatted for e-mail"; and (3) a handset unit that "is configured to a personal digital assistant (PDA) having PDA functions." A242, col. 14:21-41. No such handset is described in the issued patent.

### 1. The 1997 Application did not disclose a handset that can selectively communicate at high and low power.

Contrary to NetAirus's argument, *see* NetAirus Opening Br. (NB) 29-30, the 1997 Application does not disclose a handset that can "selectively" communicate at high and low power. The specification discusses transmitting selectively at high or low power in only two places. In both, it discusses transmission by the computer system or base unit, not the handset. *See* A239, col. 8:40-42 ("The *base unit* may be designed to allow the user to switch between a high or low level transmitting and receiving power levels." (emphasis added)); A240,

col. 9:9-14 ("A plurality of switches and indicators 46 may be located along one edge of the *base unit* … [s]uch switches and indicators may include … high/low power transmit switch." (emphasis added)). Because the specification nowhere discloses the claimed "transmit power level" elements in the *handset,* the claims fail the written description requirement of Section 112. A242, col. 13:48-14:65.

Apple's technical expert explained this to the jury from the perspective of one skilled in the art. Dr. Rodriguez explained *why* the specification did not disclose a handset communicating selectively at high or low power. A1096-97. The specification teaches that "[t]he whole idea behind the patent is the handset is *always low power*" to "minimize the … potentially harmful effects of having a high power electronic device so close to your head." *Id.* (citing A239, col. 8:56-59) (emphasis added).

Notably, Dr. Rodriguez's testimony on these points stood unrebutted. Mr. Ditzik and Mr. Blackburn both testified that the specification disclosed a handset communicating to both a local base unit and a wide area network, but neither testified that the handset could do so at *differing power levels* as the claims require. A544-46,

1267-69. On cross-examination, Mr. Blackburn admitted, repeatedly, that the specification's disclosure and depiction of a high/low power switch referred to the base unit, not the handset. A936-38. When asked directly "[i]s there a sentence in here that says the handset may be designed to allow the user to switch between high and low power levels?" he answered, "I don't believe it does." A936-37. Like Dr. Rodriguez, Mr. Blackburn found the "only comment" regarding handset power levels was that "the handset's designed for much lower RF transmit and receive electrical power levels." A2510-11 (played at A1296). "Q. Right. But there is nothing that says that the handset operates at a high RF transmit power level? A. I don't think it makes that exact differentiation, no." *Id.*

### 2. The 1997 Application did not disclose a handset that can send and receive e-mail.

NetAirus also is wrong to suggest, *see* NB 30-31, that the 1997 Application discloses a handset that can send and receive e-mail. The specification's text and figures refer to "e-mail" or "electronic mail" three times. As with the transmit power levels, each reference describes capabilities of the "computer system," not capabilities of the "handset." First, "[o]ther capabilities such as … E-mail functions may

be implemented in the *computer system*." A238, col. 6:49-54 (emphasis added). Second, "[m]any types of computer application programs may be executed by the *computer system*. For example … electronic mail … may be used." A242, col. 13:23-27 (emphasis added). Third, Figure 8, "a flow diagram of the computer system programs and operations," contains the third reference to e-mail, a box labeled "Run E/V-Mail Programs." A235, Fig. 8; A237, col. 3:48-49.

Dr. Rodriguez highlighted these portions of the specification for the jury. A1094-95. He noted, again, that the patent "equates the base unit with the computer system, not the handset." *Id.* To Dr. Rodriguez, it was "very clear" that these three references "describ[e] e-mail that's performed by the computer system, not the handset." A1091-92. And, as Dr. Rodriguez explained, the "computer system" and "handset" are "two different things in this patent." A1091; *see also* A1094-95.

NetAirus's expert agreed:

Q. I asked you during your deposition if there was any disclosure in the specification that indicates the handset is sending electronic mail as opposed to the base station; correct?

A. I vaguely remember that, yes.

Q. And you said that you were unable to do so; isn't that correct?

A. To find it in the specification?

Q. Yes. That's right.

A. At that time, yes.

Q. And you had read the patent over a dozen times before that deposition; correct?

A. I believe so.

A1294.

Mr. Blackburn further testified that Figure 8 discloses the "base unit" running e-mail programs, not the "handset":

Q: And what part of figure 8 is—well, let's go back to that box 88. "Run E/V mail programs" there.

A. Mm-hmm.

Q. That's pointing to functionality in the base station; correct?

A. I believe so, yeah, mm-hmm.

A2508 (played at trial, A1295-96). Moreover, Mr. Ditzik and Mr. Blackburn both confirmed that the 1997 Application's claims did not disclose a handset that could send or receive e-mail. A590-92; A1292.

### 3. The 1997 Application did not disclose a handset that contains PDA functionality.

The 1997 Application also does not disclose a handset that contains PDA functionality. *See* NB 29-31. Although the specification "refers" to PDA "on nearly two dozen occasions," *id.* at 9, NetAirus does not explain how any of these references relate to a handset. None do. Instead, the specification expressly uses "PDA" as a synonym for the computer system or base unit. "The computer system as used herein can also be referred to as a portable computer system, computer-display unit or base unit, and shall also include the terms: personal computer, notebook computer, sub-notebook computer or Personal Digital Assistant (PDA)." A6028; A237, col. 3:52-58.

As Dr. Rodriguez testified, here and throughout the specification, the only device with "PDA" functionality is the base unit, not the handset. A1098-100; *see also* A232, 233; A236, col. 2:44-45, 61-62; A237, col. 3:57-58; A238, col. 6:58; A240, col. 10:59 ("notebook or PDA-like computer system"); A240, col. 10:28, 57, 59; A241, col. 11:1 (Figs. 5, 6(a), and 6(b) show "notebook or PDA"). This is so because, in Mr. Ditzik's own words, "[t]his invention relates to … a computer unit, having light weight thin *notebook-like computer structure* that is

33

capable-of performing personal digital assistants (PDA) like functions." A236, col. 1:10-19 (emphasis added).

In addition, Dr. Rodriguez noted the many times during prosecution where patent examiners found that the specification only taught the base unit as a PDA, not the handset. A1101-03. Dr. Rodriguez also explained that Mr. Ditzik's 2004 submission of an altered Figure 7 drawing with the new "handset/PDA unit" instead of just "handset unit" appeared to be "an attempt for the inventor to try to change the application later in the process to try to fit in a reference to a handset configured as a PDA." A1103-05 (discussing A6480).

NetAirus points, *see* NB30, to the "Description of Prior Art" section noting that *prior art* PDAs were "small handheld units" that disadvantageously lacked "large high resolution color display[s]." A6025; A236, col. 1:25-38. Mr. Ditzik's purported invention remedied this defect by combining the relatively large display of a notebook computer with "PDA like functions" in the *computer system / base unit*. *E.g.*, A6025; A236, col. 1:11-20. Nothing in the patent suggests that the conventional cellular *handset* described as part of the invention is a PDA. Dr. Rodriguez explained that one skilled in the art would have

understood this reference to "PDAs" as "not describing the claimed invention" but rather describing the prior art devices. NetAirus cannot claim that the patent's characterization of prior art devices described its alleged invention. *See Tronzo v. Biomet, Inc.*, 156 F.3d 1154, 1159 (Fed. Cir. 1998) (claim not supported by disclosure that "served the narrow purpose of reviewing the prior art and did not describe the invention," where specification "distinguishes the prior art as inferior").

### B.    NetAirus Has Not Shown any Error

On appeal, NetAirus principally complains about the jury instruction governing the written description issue. Fed. Rule Civ. Proc. 51(c)(1) required NetAirus to contemporaneously "stat[e] *distinctly* the matter objected to and *the grounds for the objection*" (emphasis added). NetAirus objected generally to using the Northern District of California ("N.D. Cal.") model instructions (preferred by the district court) instead of the Federal Circuit Bar Association ("FCBA") model (preferred by NetAirus). *E.g.*, A11,897-900; A12,875, 13,130. But at no time before or during trial did NetAirus identify any error or omission in the written description instruction given. A7684-85, 11,652-55, 11,897-900, 12,875, 13,130.

35

NetAirus's belated argument that the "instruction was incomplete and legally erroneous," NB 17-21, should therefore be rejected. "In fairness to the trial court and to the parties, objections to a charge *must be sufficiently specific to bring into focus the precise nature of the alleged error.*" *Palmer v. Hoffman*, 318 U.S. 109, 119 (1943) (emphasis added). "A party may not state one ground when objecting to an instruction to the jury under Rule 51 and later attempt to rely on a different ground for the objection on appeal or on a motion for a new trial." 9C Charles Alan Wright & Arthur R. Miller, *Fed. Prac. & Proc. Civ.* § 2554 (3d ed.); *Schneider v. Strote*, 51 F. App'x 239 (9th Cir. 2002) (applying this principle to find waiver). Because NetAirus did not raise its current objection before the district court, this Court should not reach it.

In any event, as we explain below, the written description jury instruction was correct.

### 1. The district court properly instructed the jury on the law of written description.

A court should grant a new trial based on jury instructions only when (a) read in their entirety, the instructions were erroneous and (b) the error was prejudicial—harmless errors do not require a new trial.

*Biodex Corp. v. Loredan Biomedical, Inc.,* 946 F.2d 850, 854 (Fed. Cir. 1991). Neither error nor prejudice exists here.

The written description jury instructions given here "fairly and adequately cover[ed] the issues presented, correctly state[d] the law, and [were] not misleading." *See Duran v. City of Maywood*, 221 F.3d 1127, 1130 (9th Cir. 2000) (reciting the 9th Circuit standard) (citation omitted). The court's instruction stated: "The written description requirement is satisfied if a person of ordinary skill in the field reading the original patent application at the time it was filed would have recognized that the patent application described the invention as claimed." A1414. This is the correct written description standard. *Ariad*, 598 F.3d at 1351. It is also identical to the N.D. Cal. model. A1; *Model Patent Jury Instructions for the N.D. Cal.* § 4.2a (Nov. 3, 2011), *available at* http://tinyurl.com/ka5rzqw.

The given instruction included clarifications and caveats designed to avoid juror confusion. The jurors heard that the description "may not use the exact words found in the claim" and "need not be specifically disclosed in the patent application as originally filed" if necessarily

implied.  A1414-15.  And, the instruction noted that claims may be changed or added during prosecution.  A1414.

The instructions proposed by NetAirus differ minimally, if at all, from the instructions given.  NetAirus proposed stating that claims may change during the patent application process.  NB19.  The district court provided a similar instruction at NetAirus's insistence:  "The purpose of the written description requirement is to demonstrate that the inventor was in possession of the invention at the time the application for the patent was filed, *even though the claims may have been changed or new claims added since that time*."  A101 (emphasis added); A1414, 11,899-900.

NetAirus also proposed explaining that the patent application's "words, structures, figures, diagrams, formulas, etc." could satisfy the written description requirement.  NB19.  But the instruction given referred the jury three times to "the original patent application" or the "patent application as originally filed." A101, 1414.  It instructed that the application need not "use the exact words found in the claim."  *Id.*  And the court's subsequent response to the jury's note specified that the description includes more than just the text:

> Response to Jury Note #2:
>
> The term "written description" as used in Question 4 of the Verdict Form means what is contained in the portion of the '380 Patent (Exhibit 1306) starting on its first page (1306-00001) through and including column 13, line 46, or its 17th page (1306-00017). This includes all text and figures on these pages. It does not include the claims, which begin on column 13, line 47, on page 17.

A13,324. As the judge responded to the jury above, the description "includes all text and figures on these pages." A13,324.

Where, as here, the "jury instruction was an accurate statement of the law," "the district court's decision to use the model instruction over [NetAirus's] proposed instruction was not illogical, implausible, or without support in the record." *See United States v. Redlightning*, 624 F.3d 1090, 1122 (9th Cir. 2010). NetAirus "has no vested right in its own carefully couched form of words in an instruction …." *Biodex,* 946 F.2d at 854. The district court's instruction should therefore be affirmed.

### 2. Apple's closing argument on written description was proper and did not undermine the jury instructions.

Even if the district court erred in not giving NetAirus's instruction, it still is "more probable than not" that the verdict would not have changed and thus no new trial is needed. *See Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1218 (9th Cir. 1997).

NetAirus faces two insurmountable problems in contending, *see* NB 20-21, that the jury instructions were rendered inadequate by Apple's closing argument.

First, Apple's closing argument did not "mischaracteriz[e]" the law. The district court thoroughly "examin[ed] the statements now criticized by NetAirus" and showed how they "properly focused on the lack of support for the asserted claims in the application as filed ...." A25-26 (quoting closing argument at length). As NetAirus acknowledges, applicants may amend claims to cover the products of others, but *only* if "the disclosure supports the broadened claims." NB20 (quoting *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 900 n.2 (Fed. Cir. 2004)). This was Apple's point: "Mr. Ditzik was claiming things that he didn't disclose in his original specification." A1465. Likewise, Apple properly told the jury that "not a single sentence" in the specification described the missing claim elements. A1468. The specification's text may not be dispositive, but it is certainly relevant to the written description inquiry. *Ariad*, 598 F.3d at 1351. If the figures or original claims helped NetAirus, NB21, it "could have responded

40

simply by showing the jury where the drawings or original claims supported those elements." A26. Instead, NetAirus was silent.

This leads to the second problem with NetAirus's argument: NetAirus did nothing at the time to address Apple's alleged misstatements of the law. A25-26. NetAirus did not object during Apple's closing, address Apple's argument in its rebuttal, or repropose the FCBA instruction in light of the alleged "mischaracterizations." A1421-41, 80-85.

This Court has addressed this type of situation before. In *Beckman Instruments, Inc. v. LKB Produkter AB*, 892 F.2d 1547, 1551 (Fed. Cir. 1989), the appellant's "objection l[ay] not so much with the instructions itself, but with the combination of the instruction and certain expert testimony." Specifically, the jury instruction correctly stated the law but the expert witness did not. *Id.* This Court concluded that the error should have been corrected not "by objecting to the jury instruction, but by discrediting the erroneous expert testimony either through cross-examination or through its own expert testimony. Therefore, the district court correctly denied [the moving party]'s motion for a new trial based on the allegedly erroneous jury

instruction." *Id.*; *see also Bird v. Glacier Elec. Coop., Inc.*, 255 F.3d 1136, 1148 (9th Cir. 2001) (absent a contemporaneous objection, closing arguments reviewed only for "plain or fundamental error" "where the integrity or fundamental fairness" of the trial "is called into serious question"). The same result holds true here: Even if Apple's closing included a misstatement of law (it did not), NetAirus's failure to object or respond doomed its new trial motion.

### 3. The district court's response to the jury question was correct and did not undermine the jury instructions.

"After conferring with, and obtaining the approval of, both parties as to the precise language of an appropriate response" to a jury question regarding written description, the district court correctly declined NetAirus's belated request for a supplemental response. A26. During deliberations, the jury sent a note asking whether the term "written description" in the invalidity verdict form referred to "the words within the section termed 'Detailed Description' on pg. 1306-00012 of Patent '380, or to the words within the claims *of the same patent*?" A13,323 (emphasis added). This question has a straightforward answer. An issued patent's claims do not suffice as their own written description,

else every claim would necessarily meet the written description requirement.  The parties and district court quickly agreed on a response indicating that the "written description" did not include "the claims which begin on column 13, line 47 on page 17" of the '380 patent.  A1527.  After the district court gave the agreed response, over an hour passed.  A1527-28.  NetAirus's counsel then returned, suggesting that the original application claims should be mentioned to the jury in some way (NetAirus did not propose any particular instruction).  A1528.  The district court declined.  A1529-30.

NetAirus submits on appeal that the jury would have found written description support in the original claims.  NB 26-27.  Not so.

The district court did *not* "instruct[] the jury to ignore the original claims" as NetAirus inaccurately states.  NB 21-22.  The jurors did not ask about the original application claims, and the response only addressed the patented claims.  NetAirus posits that the "claims" would "necessarily include the original application claims," NB 22, but that is not true either generally or specifically for the '380 patent.  *Compare supra at* 9-10 (original application claims) *with* 12-13 (asserted claims).  In denying NetAirus's new trial motion, the district court "assume[d]

43

without deciding that, as NetAirus argues," original claims could

provide written description support for any issued claims. A24. The

district court did *not* decide that original claims could only support

issued claims with "similar scope and wording." *See* NB23

(mischaracterizing the district court's opinion). NetAirus plucks that

phrase from the district court's out of context. The entire sense reads:

"*Apple argues that*, for a later-added claim to be described by original

claims, it must be of similar scope and wording."[6] A24.

In any event, "NetAirus did not argue original claim 7 [or the

other original claims] to the jury or highlight it in trial testimony." A26

n.7. NetAirus does not dispute this. *See* NB25-27. The district court

accordingly decided that "NetAirus's proposed instruction did not cover

an 'issue presented'." A27 (quoting *Duran*, 221 F.3d at 1130). While a

party is entitled to an instruction about its theory of the case, "[t]his

was not NetAirus's theory of the case." *Id.* (citing *Jones v. Williams*,

297 F.3d 930, 934 (9th Cir. 2002)). Although the district court told

---

[6] Apple's argument correctly stated the circumstances in which
original claims may provide written description support. *In re Keller*,
613 F.2d 819, 823-24 (C.C.P.A. 1980). But this Court, like the district
court, need not reach this issue here.

counsel that witnesses should not read exhibits into the record, NB26 (citing A576), this did not excuse NetAirus's failure to present the issue. As the court also instructed, witnesses did not need to read exhibits because counsel could "[m]ake arguments later." A542. "NetAirus was free to make this precise argument to the jury, but it did not do so. The proposal to add this instruction during jury deliberations simply came too late." A27.

Moreover, any error in not mentioning the original claims in the jury instruction could not possibly have changed the outcome and was thus harmless. *See Amazon*, 658 F.3d at 1339 (general jury verdict of invalidity stands if any alternative arguments stand). NetAirus argued below (in its post-trial briefing) that original application claim 7 taught a handset that could switch selectively between high and low power. A14,025. NetAirus did *not* contend the original claims described the "e-mail" or "PDA" claim elements. A14,023-25, 14,347-49. As the district court explained, there were "two fully sufficient independent factual grounds for the jury's finding [of invalidity] … unrelated to the issue of the original claims." A27. Accordingly, regardless of any instructional

error, it still is "more probable than not" that the verdict would not have changed and thus no new trial is needed.  *See Image*, 125 F.3d at 1218.

On appeal, for the first time, NetAirus argues that the original claims support the handset/e-mail and handset/PDA elements.  NB26. This new argument is waived.  *E.g.*, *Wordtech Sys., Inc. v. Integrated Networks Solutions, Inc.*, 609 F.3d 1308, 1318 (Fed. Cir. 2010) (theory not raised in Rule 50 and Rule 59 motions is waived on appeal). Besides being untimely, NetAirus's argument does not square with the claim language.  Original dependent claim 9, the only claim cited in support of NetAirus's new argument, refers to "application programs *on the microprocessor means*."  A6088-89 (emphasis added).  "The microprocessor means" refers back to independent claim 8, which clarifies that the "microprocessor means" is in the "base unit," not the separately recited "handset unit."  *Id.*  Mr. Blackburn confirmed this fact without reservation: "Q.  Would you agree with the fact that in 1997, April 1997, there were no claims that included a handset with email or PDA?  A.  Yes."  A1292.  Mr. Ditzik "testified regarding the original claims," NB26, but only to confirm that none were directed to the handset.  A591-592.

### 4. NetAirus's remaining complaints related to the written description jury verdict are meritless.

NetAirus offers a grab bag of other complaints related to the written description ruling.  None have merit.

For several reasons, Dr. Rodriguez's alleged misstatement of the written description legal standard does not help NetAirus.  NetAirus complains about the way Dr. Rodriguez once *stated* the written description test, emphasizing his comment that the patent must describe "how to make the claimed invention."  *See* NB28-29.  But "NetAirus has not shown that Rodriguez *applied* the incorrect standard …."  *See* A30 (emphasis added).  Throughout his testimony, Dr. Rodriguez stated and applied the proper standard.  He correctly noted, "[t]he patent law requires that your invention has to be fully disclosed in your original patent application."  *E.g.*, A1105.  He then searched for disclosure of the claim elements, and testified that the needed disclosure was missing.  *E.g.*, A1094 ("I went to the patent specification looking for a disclosure of [the selective communication] element");  A1090 (explaining that he could not find the three claim elements described in the patent specification).

Moreover, NetAirus's remedy for any misstatement of the law was

47

to "discredit[] the erroneous expert testimony either through cross-examination or through its own expert testimony." *See Beckman*, 892 F.2d at 1551 (denying motion for new trial). NetAirus had many options: cross-examine Dr. Rodriguez to show he used the wrong standard, argue the point in closing, ask that his testimony be stricken under *Daubert*, or seek a curative instruction. NetAirus elected to do nothing, remaining silent until post-trial briefing. That was too late.

Furthermore, "any misstatement by [the] expert of [the] relevant legal definition [was] harmless where [the] court 'properly instructed the jury … as to the weight to be given expert testimony.'" *Maix v. Virani*, 253 F.3d 641, 668 (11th Cir. 2001) (citation omitted); *cf. Van Buskirk v. Baldwin,* 265 F.3d 1080, 1084-85 (9th Cir. 2001) (even a court's misstatement of the legal standard was harmless when the court applied the correct standard). The district court here instructed the jury to "follow the law as I give it to you," A79, and instructed the jury on the written description legal standard (including "possession"), not enablement. A101. The district court also instructed that expert opinion testimony could be freely accepted or rejected. A63.

The case NetAirus cites does not support its position. NB29

48

(citing *Integra Lifesciences I, Ltd. v. Merck KGaA*, 496 F.3d 1334, 1342 (Fed. Cir. 2007)).  In *Integra*, the appellee's trial argument was based on a statutory interpretation that the Supreme Court ultimately rejected. 496 F.3d at 1340-41.  Thus, the appellee's expert provided no factual evidence to support the verdict under the correct legal standard.  *Id.* at 1341-42.  Taken in context, the quoted sentence from *Integra* does not apply here where the expert provided competent evidence under the correct legal standard.

NetAirus's expressed unhappiness with Dr. Rodriguez's supposed use of the wrong legal standard is ironic considering that NetAirus elicited legally irrelevant testimony from Mr. Ditzik that he "possessed" the invention when he filed the application, A541, and then cited this testimony in its rebuttal closing:  "Read the instruction on this.  It says, you have to show the inventor was in possession of his invention at the time he made it.  I asked Mr. Ditzik that question.  And he answered it, 'I was in possession.  I described it.  I wrote it.'"  A1482.  Mr. Ditzik's present-day subjective beliefs mean nothing because the written description test "requires an objective inquiry into the four corners of the specification."  *Ariad*, 598 F.3d at 1351.

49

Dr. Rodriguez's complete testimony does not resemble the cases cited by NetAirus.  NB30-31.  NetAirus misleadingly portrays the evidence by citing to Dr. Rodriguez's testimony *summarizing* his opinions.  NB30.  While it is literally true that these particular statements were conclusory, he made them *after* he explained in detail the basis for his opinion, when asked:  "What is your conclusion about the written description [as to each of the three claim elements]?"  A1092-93, 1097-98.  His testimony *as a whole* was not conclusory, as recounted *supra*, in Section I.A.  A29-30 (district court rejecting NetAirus's "conclusory" argument).  *Compare with Alcon Research Ltd. v. Barr Labs., Inc.,* 745 F.3d 1180, 1191-92 (Fed. Cir. 2014) (challenger presented "no evidence" on point); *CytoLogix Corp. v. Ventana Med. Sys., Inc.* 424 F.3d 1168, 1176 (Fed. Cir. 2005) (expert stated, without explanation, that he could not find support for claim in specification).

NetAirus also inaccurately states that the trial court relied only on Dr. Rodriguez's testimony in denying its post-trial JMOL motion.  NB27.  In fact, the court cited Mr. Blackburn's admissions and Mr. Ditzik's testimony.  A28-29.  The jury could have believed Mr. Blackburn's deposition testimony that he could find no written

description support for the "e-mail" and "selective communication" claim elements after reading the patent over a dozen times, and disregarded the different story he told at trial. *See Bard Peripheral Vascular, Inc. v. W.L. Gore & Assocs., Inc.*, 670 F.3d 1171, 1181 n.4 (Fed. Cir. 2012), *aff'd in relevant part*, 682 F.3d 1003. It could have then relied upon Mr. Blackburn's concessions against his sponsoring party to prove invalidity. *See Abbvie Deutschland GmbH & Co., v. Janssen Biotech, Inc.*, __ F.3d __, Nos. 2013-1338, 1346, 2014 WL 2937477, at *11 (Fed. Cir. Jul. 1, 2014) (where "expert conceded that the [patents-in-suit] do not disclose structural features common to the members of the claimed genus," and patent did not "sufficiently otherwise describe representative species to support the entire genus," the patent was invalid for lack of written description).

* * *

As the PTO examiners, the district court, and the jury all recognized, the claims of the '380 patent are not supported by the patent's description. The patent describes a computer system with a conventional handset. The claims are for a handset with advanced features such as transmission power level selection, e-mail

communication, and personal digital assistant functions.  The district court should be affirmed.

## II.  THE CLAIMED INVENTIONS WERE OBVIOUS IN LIGHT OF THE HANDSETS DESCRIBED IN PRINTED PUBLICATIONS AND THE GSM STANDARD

The jury found the '380 patent obvious, A5-6, and the district court's order recounts the ample evidence of obviousness.  A19-22. Richard Ditzik did not invent a handset with cellular phone, e-mail, and PDA capabilities.  The Nokia 9000 and Simon handsets performed those functions before the 1997 Application was filed.

On appeal, NetAirus argues that one skilled in the art would not have been motivated to combine either the Nokia 9000 or Simon handsets with the GSM cellular standard specifications, NB38-41, and that the prior art did not teach the "selectively" claim element.  NB33-37.[7]  The arguments lack merit.

---

[7] NetAirus presented no evidence of secondary considerations of non-obviousness; the only secondary considerations evidence was NetAirus's failure to license the '380 patent, which (as Mr. Blackburn agreed) tended to show obviousness.  A1289-91, 1297-1300.

## A. The Claimed Invention Is Obvious in Light of the Devices Described in *The San Francisco Chronicle* and *Byte Magazine* and the GSM Standard

A patent should not issue if "the invention was patented or described in a printed publication" "more than one year prior to the date of application for patent in the United States." 35 U.S.C. § 102(b).[8] And even "though the invention is not identically disclosed or described" in a single § 102(b) prior art reference, "a patent is obvious if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious" to one of ordinary skill in the art at the time of invention. 35 U.S.C. § 103(a).

Here, the jury concluded that two sets of documents each rendered the claimed invention obvious. The GSM standard, or Global System for Mobile, was a popular cellular network used primarily in Europe. A20; A5787-5821; A5822-5861. The GSM standard disclosed two types of base transceiver stations: a BTS and a micro BTS. A20; A1111-12; A5828. BTSs—regular cellular base stations—met the claimed

---

[8] The cites to 35 U.S.C. §§102 and 103 here are to the applicable version prior to the 2011 America Invents Act revisions.

"external wide area network." A21; A1116; A1118-19. Micro BTSs—smaller and lower-power cellular base stations covering a small area (like a room in a building)—met the claimed "local area [communication] base unit." A20 A1116; A1117-18; A5830.

The first set of documents that rendered the claimed invention obvious was the GSM standards documents combined with a *San Francisco Chronicle* article describing the Nokia 9000. The Nokia 9000 was a handset with e-mail and PDA capabilities that operated on the GSM cellular network. A7134. The *Chronicle* article notes that "GSM is an advanced form of digital telecommunications that can handle sophisticated data transmissions." *Id.*

Dr. Rodriguez (at A1108-22 and A1147-60) explained to the jury how the GSM standards documents and the *San Francisco Chronicle* article invalidated the patent. Taken together, these documents described how a phone operating on the GSM cellular network, like the Nokia 9000, would have worked at the time. A20 (citing A1150-56).

The second set of documents that rendered the claimed invention obvious was the GSM standard combined with a *Byte Magazine* article describing the Simon device. A21; A7103-07. The Simon device

operated on a different cellular network. A1161-62. Dr. Rodriguez

explained why one skilled in the art would have combined the teachings

of an article describing the Simon PDA with the GSM standards—

namely, "to open up a broader market for the device." A1162; A21,

7103-07. As the district court noted, A21, the Supreme Court cited

similar marketplace incentives to find obviousness in *KSR Int'l Co. v.*

*Teleflex Inc.*, 550 U.S. 398, 424 (2007).

In light of the above evidence, the jury was correct to find the

patent obvious and, at a minimum, the district court was correct to

uphold the ruling as supported by substantial evidence. NetAirus

challenges two factual findings underpinning the jury verdict. *See Alza*

*Corp. v. Mylan Labs., Inc.*, 464 F.3d 1286, 1289 (Fed. Cir. 2006)

(motivation to combine); *Graham v. John Deere Co.*, 383 U.S. 1, 18

(1966) ("the differences between the claimed invention and the prior

art"). Accordingly, NetAirus must show an absence of substantial

evidence supporting the verdict. *Kinetic Concepts*, 688 F.3d at 1356-57.

NetAirus fails to do so. *See infra*, II.B and II.C.

**B.    There Was Ample Motivation to Combine the GSM Standard with the Devices Described in The *San Francisco Chronicle* and *Byte Magazine***

NetAirus argues (at NB39) that Dr. Rodriguez did not explain "*why*" one would combine the GSM standard with either the Nokia 9000 or Simon devices.  But the "why" is right there in the testimony quoted by NetAirus:  "[A] person having ordinary skill in the art at the time would know that in order to figure out how that phone functions, you could look at the GSM standards document that describes in detail all of the principles for GSM cell phone communication."  NB38-39 (citing A1159-60).   As the district court explained, "[b]ecause the Nokia 9000 was a GSM device, the only motivation needed to combine the references was the desire to understand how the Nokia 9000 would operate on the GSM network."  A21.  So too for the Simon combination. *Id.* (citing A1162).

Although the Simon device did not work on the GSM network, "[t]he desire to adapt a phone for use on a widely-used network to increase sales is an adequate motivation to combine."  *Id.*  Furthermore, the '380 patent itself "assumes that it is within the ability of a person of ordinary skill in the art to configure a phone to operate on" either

digital or analog networks. A20-21 (citing A238, col. 5:59-62). This refutes NetAirus's claim that adapting Simon to the GSM network would have been beyond an ordinarily skilled artisan. A20-21.

NetAirus presented *no* evidence or argument on motivation to combine at trial. It did not cross-examine Dr. Rodriguez on his opinion in this regard. *See* A1177-1207. It did not mention motivation to combine in its opening or closing arguments. A295-97; A1421-41, 80-85. NetAirus's expert was not allowed to testify on motivation to combine because it was beyond the scope of his report. A1288. Apple's evidence thus stood unrebutted.[9]

In any event, Apple's obviousness theory presented the clearest possible motivation to combine: an express suggestion in one prior art reference to consider the other references. "Reliance on press releases or articles that discuss the combination of two products is sufficient evidence to support the combination." A21 (citing *Brown & Williamson Tobacco Corp. v. Phillip Morris Inc.*, 229 F.3d 1120, 1126-28 (Fed. Cir.

---

[9] NetAirus only challenges the motivation to combine the primary prior art references. Apple further combined these references with additional references for certain dependent claims. A1156-60, 1168-71. NetAirus's expert conceded that all challenged claims would rise and fall together. A1304.

2000)).  This Court has found sufficient motivation to combine in prior cases where one prior art reference explicitly discusses another.  *Norian Corp. v. Stryker Corp.*, 363 F.3d 1321, 1328 (Fed. Cir. 2004) (affirming denial of JMOL after jury verdict of obviousness); *Optivus Tech., Inc. v. Ion Beam Applications S.A.*, 469 F.3d 978, 990-91 (Fed. Cir. 2006) (affirming summary judgment of obviousness).

NetAirus relies on readily distinguishable cases.  NB39-41 (citing *InTouch Techs., Inc. v. VGO Commc'ns, Inc.*, 751 F.3d 1327 (Fed. Cir. 2014) and *ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*, 694 F.3d 1312 (Fed. Cir. 2012)).  Dr. Rodriguez explained why a contemporary artisan *would* have combined the references, A1159-60, he did not merely state that a present-day artisan *could* have done so as did the testimony in *InTouch*.  *See* 751 F.3d at 1351-52.  And unlike *InTouch*, the roadmap for putting together the references were the references' teachings themselves and basic market incentives, not the challenged patent claims.  *Compare with id.* at 1351.  Apple's evidence of motivation to combine related to each specific combination of prior art elements; indeed, Dr. Rodriguez's articulated reasoning differed between the Nokia 9000 and Simon combinations.  *Compare with*

*ActiveVideo* at 1328 (dismissing "generic" testimony not tied to specific references).

## C.    The GSM Standard Taught "Selective" Communication

NetAirus's suggestion that "selective communication" is a "unique idea," NB6, is wrong:  a handset communicating "selectively" between local base stations and wide area networks was part of the GSM standard well before Mr. Ditzik's alleged invention.

A handset operating on the GSM network would communicate "selectively" with a BTS or Micro BTS using "adaptive power control." The district court summarized the evidence:  "[Rodriguez] testified that the handset communicates back and forth with both the micro BTS and the BTS.  Rodriguez also explained that, through the adaptive power control feature of the GSM network, phones would communicate either with the BTS or micro BTS depending on the distance involved …."  A20 (citing A1119-21).

This selective communication, called "handover," was controlled automatically by the GSM system, depending upon the received cellular signal level and quality.  A1112-13, 1119-20, 14,669.  In sum, "the GSM standard document discloses how the communication is selectively

partitioned between the micro BTS and the normal BTS." A1209.

"Adaptive power control" also controlled handset power transmission level in a way that met the "transmit power level" elements. Usually, the handset transmission power level was much higher when transmitting to the more-distant BTS than the nearby Micro BTS: up to 640 Watts versus up to 0.25 Watts, respectively. Those different base station transmit power levels mean that the handset can communicate with a BTS from a greater distance, but the handset will also need to transmit to the BTS at a higher transmit power level. A20 (citing A1119-21); A5831.

NetAirus's expert did not disagree with any of these facts; instead, he confirmed them. He testified at length about how handsets in the GSM system would transmit to either a Micro BTS or BTS, as determined by a base station controller in the GSM system. A1280-82; *see also* NB37 (acknowledging that the handset communicates with the BTS or Micro BTS).

NetAirus highlights that the word "selectively" was not on Dr. Rodriguez's demonstrative claim chart. NB34-35. This means nothing. The chart just summarized each claim element in a few words.

A14,663-65. His other demonstrative exhibits depicted the full claim language, including "selectively." A1180-81. And Dr. Rodriguez's testimony explained how the "adaptive power control" feature met this claim language, as described above. A1119-22. So did the district court's opinion. NetAirus criticizes the trial court's opinion for not including the word "selectively," NB36-37, ignoring that the trial court addressed this term in substance by thoroughly explaining GSM's "adaptive power control." A20.

NetAirus next argues that Dr. Rodriguez addressed "key" claim elements to the exclusion of other claim elements. NB35-36. But Dr. Rodriguez colloquially referred to *every* claim element as a "key" element or feature, as a review of his testimony makes clear. A1093, 1116, 1118, 1148, 1149, 1150, 1151, 1164, 1166, 1167, 1170. Indeed, he called the claim elements reciting "selectively" "key elements." A1093, 1179-81.

NetAirus's last argument rests on an incorrect claim construction. Before trial, NetAirus proposed construing "selectively" to require that software on the handset must "select" whether to communicate to the local base unit or the external network. A14,672-74. But the claims

just say the handset must "communicate" with or "transmit" to the local unit and wide area network "selectively," and do not specify who or what controls that selection. A8765; A242, col. 13:56, 14:26, 29. As a result, the district construed "selectively" as "not limited to automated selection; instead, it embraces both manual and automatic selection." A8765. The jury was charged accordingly. A75.

On appeal, NetAirus argues that the GSM "adaptive power control" discussed above did not teach communicating "selectively" because a base station determines whether the handset transmission went to a Micro BTS or BTS. This argument, and Mr. Blackburn's related testimony, rests on this premise: "The language of the claims, in essence, recites the ability of the *handset* to 'select' between a local area base unit and an external wide area network." NB34 (emphasis in original); NB37 (citing A1283-84). But, as the district court found, that reading of the claims is wrong. NetAirus has *not* challenged the district court's contrary construction. *See* NB33-37. Mr. Blackburn's opinion that "[i]t has to be the handset" that "determin[es] which base station transceiver to use" expressly conflicts with the claim construction, and

thus has no probative value.[10]  *Novartis Pharms. Corp. v. Abbott Labs.*, 375 F.3d 1328, 1339 (Fed. Cir. 2004) (where theory of infringement was "inconsistent with … claim construction," the court "must reject [the] theory of infringement").

Even if the operative "selectively" construction did not foreclose NetAirus's non-obviousness theory, NetAirus still would not be entitled to JMOL.  At most, there would be a disagreement between the experts about whether the prior art differed from the claimed inventions—a fact question.  *See Verizon Servs. Corp. v. Cox Fibernet Virginia, Inc.*, 602 F.3d 1325, 1338-39 (Fed. Cir. 2010) (where validity turned on battle of experts, jury verdict that some patents were invalid was supported by substantial evidence).  The jury could have discredited Mr. Blackburn's opinion.  *See supra* at 21.  The jury also could have viewed Mr. Blackburn's opinion with skepticism given that he had not previously disclosed it, a fact exposed during cross-examination.  A923-29.

---

[10] The district court's post-trial motion ruling did not address the inconsistency between Mr. Blackburn's testimony and the "selectively" construction, likely because NetAirus first advanced this argument in its JMOL reply brief.  *See* A13,139-40 (NetAirus's opening JMOL brief only asserting that Dr. Rodriguez's testimony did not prove obviousness).

* * *

In sum, substantial evidence supported the jury's finding that the

Nokia 9000/GSM and Simon/GSM prior art combinations taught the

claimed inventions.

## III. NETAIRUS DID NOT PROVIDE SUFFICIENT EVIDENCE OF INFRINGEMENT

The asserted claims are method claims, and NetAirus pursues

only *direct* infringement against Apple based on the iPhone 4.

Accordingly, to prove infringement, NetAirus needed to show that Apple

*performed* all steps of a claim using an iPhone 4.  35 U.S.C. § 271(a).

The jury correctly found it had not.  A4.  NetAirus agreed to the

submitted jury instruction on direct infringement and further

instruction was unnecessary.

### A. NetAirus Did Not Prove that Apple Practiced the "Transmit Power Level" Element

NetAirus's infringement theory relied on a chain of assumptions

and inferences, challenged by Apple, which the jury was not required to

accept.  In particular, NetAirus "needed to prove" that the "capabilities

of the iPhone 4 had actually been used by Apple in the manner set forth

by the asserted claims of the '380 patent."  NB48.  One of those claimed

capabilities is "selectively" transmitting at a higher transmission power

level when transmitting e-mail.  A14.  When the handset transmits

e-mail data locally, the transmit power level must be "lower than the

power level required to transmit the signal to the external wide area

network." A242, col. 14:31-36.  But neither the "probability curves," nor

internal testing, nor any other evidence offered by NetAirus showed

infringement of the "transmit power level" element during the sending

of an e-mail by an iPhone.

NetAirus largely relied upon "probability curves" to show

infringement of the "transmit power level" step. NB49.  These

"probability curves" were industry standard documents showing general

patterns of use in cell phones.  A1176.  The curves purported to show

that the cellular transmit power level would exceed 15 dBm (the

approximate Wi-Fi transmit power level) in 2.4% or 7.5% of phone calls.

NetAirus pointed to Wi-Fi transmissions as the "local" transmissions.

"NetAirus failed to connect adequately" these documents "with

Apple's performance of the other steps." A17.  As the district court

explained, the curves "showed only general patterns, were not specific

to the iPhone 4 and did not refer specifically to a scenario where phones

were transmitting email.  Dr. Rodriguez also testified that a different

type of analysis would have to be performed to determine power levels during the sending of email." A17 (citing A1176).

In other words, NetAirus presented evidence that in general a phone's cellular transmit power could exceed the Wi-Fi threshold a very small percentage of the time, but did not present evidence that either (a) these *general* percentages applied in the *specific* circumstance of a phone sending e-mail over Wi-Fi or (b) any Apple employee had used an iPhone to send e-mail while the iPhone's cellular power exceeded 15 dBm.

Post-trial, NetAirus attempted to bridge the gap by arguing, for the first time, that the claims did not require the handset to send an e-mail when the "transmit power level" element was met. A13350-51; A14589-60. NetAirus tries again here, NB54-55, arguing that the claimed method is practiced anytime an e-mail is sent so long as the cellular transmit power exceeds the Wi-Fi transmit power at some time during the life of the phone. *Id.*

NetAirus's claim construction argument is "untimely." A17. "Even if [NetAirus] were correct that the parties' disagreement concerned the scope of the limitation, [NetAirus] waived this argument

by not raising it before the district court." *See Lazare Kaplan Int'l, Inc. v. Photoscribe Techs., Inc.*, 628 F.3d 1359, 1376 (Fed. Cir. 2010) (waiver when appellant "first asserted the claim construction argument it presses on appeal in a post-trial motion").

The waived claim construction argument is also wrong. NetAirus suggests that the claims cover a device that transmits e-mail locally so long as, at some other point in time ("not in any way bound by a specific time period"), the device also transmits data to a wider area at a power level that is higher than the local e-mail transmission. NB54-55. But under NetAirus's construction, the claims would also reach a device that locally transmits an e-mail at a power level that turns out to have been higher (rather than lower) than the power required to transmit the data to a wider area. That result is foreclosed by the plain language of the claims. Claim 7, for example, provides that the handset communicate "data formatted for e-mail" with both a "local area base unit" and an "external wide area network." A242, col. 14:23-41. And the claim requires that when the handset transmits e-mail to the local area base unit, the transmit power level "is lower than the power level

required to transmit the signal to the external wide area network."
A242, col. 14:31-36.

NetAirus's construction finds no support in the specification; just the opposite. The sole reason why the handset communicates locally, rather than directly to the external network, is that local communication requires lower power. *See* Section I.A.1 *supra.* NetAirus's construction expands the claims to cover the indirect local transmission when it would drain less power to communicate directly with an external network—the handset described in the patent would have no reason to do that.

Indeed, NetAirus indirectly acknowledged the requirement that an infringing device transmit at a higher level *when transmitting e-mail.* NetAirus attempted to quantify indirect infringement by multiplying the number of iPhone 4 devices sold, by its estimated number of e-mails sent per device per month, by the 2.4% and 7.5% probabilities of the *transmit power curves.* A1437. That last step reduced NetAirus's estimate from 6.6 billion infringing uses to 158-495 million. *Id.* And it would have been unnecessary if, as NetAirus belatedly argues, the claimed method is practiced anytime an e-mail is

sent.  Further, Mr. Blackburn's testimony accords with this understanding of the claims.  A945.

Aside from the general power level probability curves, NetAirus cites William Noellert's testimony that Apple "calibrate[s] the device at the factory" to make sure that it can operate at the maximum transmit power level.  NB47, 52 (citing A1041).  But NetAirus omits the critical fact:  Apple tests the maximum cellular transmit power using an *emulator*, not the actual cellular network.

Mr. Noellert is an engineering manager in Apple's RF (radio frequency) design group, which is responsible for developing all of the wireless hardware for the iPhone 4.  A1013.  He explained how Apple measures the cellular transmit power of iPhones during testing:

> It's quite difficult to make these measurements. You need to do them in a very controlled environment. So we—and it's standard in the industry—use a very large chamber.  It's called an anechoic chamber.  But basically it's a big metal box about the size of a bedroom, maybe sometimes even a little bigger, and it's filled with insulating material that prevents the radio waves from bouncing around inside of the chamber.  So you put your device in the chamber, and also in the chamber would be a hookup *for a simulator that is going to simulate what the AT&T or Verizon network tower would do*.

> So the device goes in the chamber. The chamber
> door is closed to make sure that there is no
> interference or you are measuring something you
> don't mean to measure, and then the test is
> conducted. The device is commanded to go to its
> maximum level.

A1028-29 (emphasis added).

Mr. Noellert further explained that real data, such as e-mail, is not used during this testing, and it does not demonstrate normal use. A1029. This testimony was confirmed by the director of wireless hardware design engineering at Apple (and Noellert's supervisor): "I don't think that Apple has ever measured the radiated transmit power of the—of a device when it was not connected to a base station emulator." A1950-51. Accordingly, this testing does not show that any iPhone meets the "transmit power level" element. *See also* A17 (district court noting that the internal testing was not tied to practice of claims).

None of the remaining evidence of Apple employees using iPhone 4 devices showed infringement of the "transmit power level" element. While NetAirus largely recognizes that its expert's testimony cannot support JMOL, *see* NB52-53, NetAirus does suggest that Mr. Blackburn's "unrebutted" account of an Apple employee demonstrating an iPhone 4 must be accepted as true. *See* NB49, NB53. Not so. The

jury, as the ultimate credibility arbiter, could have disbelieved *all* of Mr. Blackburn's claims. "[T]he jury is not required to accept testimony as true, even if it is uncontradicted." *Amsted Indus. Inc. v. Buckeye Steel Castings Co.*, 24 F.3d 178, 183 (Fed. Cir. 1994) (citation omitted). "Given the cross-examination at trial, the jury was entitled to give little weight to Blackburn's trial testimony." A17; *supra* at 21.

Assuming the alleged demonstration actually happened, the Apple employee only "carr[ied] out *the majority of the claimed steps*," NetAirus admits. NB49 (emphasis added). "It is not disputed that the Apple products *could* infringe. However, such testimony alone is not sufficient to find … infringement of a method patent. Evidence of actual use of each limitation is required." *Mirror Worlds, LLC v. Apple Inc.*, 692 F.3d 1351, 1358-61 (Fed. Cir. 2012) (affirming JMOL of no direct or indirect infringement based on no evidence that anyone used the claimed method); *ePlus, Inc. v. Lawson Software, Inc.*, 700 F.3d 509, 521-22 (Fed. Cir. 2012) (undisputed capability of accused product to perform method did not support jury verdict of infringement). "Blackburn did not measure the transmission power levels during those demonstrations." A17 (citing A804-10). And, for the reasons explained

71

*supra*, the "power curve" and "calibration" evidence does not prove that these alleged demonstrations met the "transmit power level" elements.

Likewise, Noellert's description of his personal iPhone 4 use does not establish infringement. *See* NB48-49. Noellert never said what power level he used to transmit data with his iPhone 4. A1037-44. NetAirus relies solely on the "probability curves" to claim that Noellert's iPhone 4 met the "transmit power level" limitations. As explained above, this is inadequate.

There is one final defect in NetAirus's infringement case: It did not prove that any of the alleged "infringements" by Apple occurred during the term of the reexamined claims. Apple did not infringe the '380 patent unless it practiced the claimed method(s) *after* the reexamination certificate issued on October 8, 2012. A4070. Practicing a claimed method does not infringe unless *all* steps are performed *during the patent's term*. *Welker Bearing Co. v. PHD, Inc.*, 550 F.3d 1090, 1095 (Fed. Cir. 2008) ("The patentee may of course obtain damages only for acts of infringement after the issuance of the patent.") (citations omitted). NetAirus presented *no* evidence from *any* Apple employee that he or she had used an iPhone 4 after the reexamination

certificate issued. Noellert used his iPhone 4 in 2011, A1037-44, there was no evidence on when the "calibration" testing happened, and the alleged demonstration witnessed by Mr. Blackburn apparently occurred in 2011. A800-10; *see also* A2934; A3207 (iPhone 4 user guide purportedly obtained by Mr. Blackburn when he purchased the device, copyright 2011).

### B. The District Court Properly Declined to Give NetAirus's Redundant Jury Instruction

The parties *agreed* on a direct infringement instruction that was read to the jury. A13,104. The district court began by explaining "method" claims and how they are infringed:

> When a thing (in this case, a method) meets all of the requirements of a claim, the claim is said to "cover" that thing, and that thing is said to "fall" within the scope of that claim. In other words, a claim covers a method where each of the claim elements or limitations is present in that method.

A91. Then the court specifically addressed infringement: "To prove direct infringement in this case, NetAirus must prove that Apple alone—not its customers or some other party—performed each step of the asserted patent claim using an accused iPhone 4." A95.

The agreed-upon instruction was accurate, complete, and *did* address NetAirus's "theory of the case." NetAirus's proposed supplemental instruction addressed so-called "part-time infringement," NB58, but nothing in the instruction given suggested that "part-time infringement," A17, would escape liability. Just the opposite: The instruction states that Apple infringed if it performed each step of the method, period. Additional language made clear that one infringing use was enough: "[Y]ou must … decide whether *a* use of Apple's accused iPhone 4 practiced *a* method that infringes that claim." A95 (emphasis added). The instructions thus fully embodied the rule that an accused product that practices the claimed method sometimes still infringes. *See* NB59-60 (citing cases stating this general rule).

This instruction was not "tantamount to directing a verdict" for Apple. NB60-61 (citing *Don Burton, Inc. v. Aetna Life & Cas. Co.*, 575 F.2d 702, 706 (9th Cir. 1978)). In *Don Burton*, the insurer's arson theory was that the "insured had aided, abetted, or procured the setting of the fire." *Id.* The jury instruction effectively doomed that theory because it only allowed for the insured himself to be the arsonist. *Id.* at 704-06. In contrast, NetAirus's direct infringement theory was that at

74

least some iPhone 4 uses would infringe, and the jury instruction fully embodied this theory by allowing infringement based on "a use" of the claimed method. A95

The district court correctly exercised its discretion in declining NetAirus's unnecessary and confusing additional instruction. NetAirus proposed: "Imperfect practice of an invention does not avoid infringement. An accused product that sometimes, but not always, embodies or performs the claim limitations nonetheless infringes." A12,884. The first part, "[i]mperfect practice of an invention," is a distinct concept from "part-time infringement." *See Paper Converting Mach. Co. v. Magna-Graphics Corp.*, 745 F.2d 11, 20 (Fed. Cir. 1984) (origin of the "imperfect practice" quote, arising from an infringer testing a less-than-complete but still operable version of a patented machine).

The rest of the instruction just recasts concepts already present in the court's instruction in different words. A trial court "need not incorporate every proposition of law suggested by counsel so long as he adequately covers the principles necessary for jury guidance." *Van Cleef v. Aeroflex Corp.*, 657 F.2d 1094, 1099 (9th Cir. 1981) (citations

omitted). Even if NetAirus's instruction is more "precise" or "detailed" than the one given, its omission does not justify a new trial. *See Gracie v. Gracie*, 217 F.3d 1060, 1067 (9th Cir. 2000) (declining to order new trial given the trial court's discretion to formulate jury instructions). Moreover, this instruction would have confused the jury. A18. NetAirus was pursuing both direct and indirect infringement at trial. "[T]he instruction implied that the jury should focus only on the product, and not Apple's inducing conduct." *Id.*

Finally, NetAirus suffered no prejudice even if the court's infringement instructions were erroneous. Once again, NetAirus claims prejudice based on a closing argument it did not object to at trial. NB58-62; *see supra* Section I.B.2 (addressing same deficiency in NetAirus's written description new trial argument). "Nor did NetAirus renew its call for a 'part-time infringement' instruction in light of Apple's argument. Nor did NetAirus choose to address the point in its rebuttal …. [Thus,] NetAirus cannot presently argue with any force that this instruction should have been used." A19. Besides, NetAirus misunderstands the closing argument: Apple argued that "it had proven that infringement could occur, at most, a small percentage of the

time, and that NetAirus did not prove infringement during that time."

*Id.* NetAirus presented no competent evidence of infringement.

## CONCLUSION

For the foregoing reasons, this Court should affirm.

Dated: August 12, 2014

Respectfully submitted,

By: */s/ Mark S. Davies*
Mark S. Davies
ORRICK, HERRINGTON &
   SUTCLIFFE LLP
1152 15th Street
Washington, D.C. 20005
mark.davies@orrick.com

*Attorney for Defendant-Appellee
Apple Inc.*

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on this 12th day of August, 2014, I caused the

foregoing Response Brief of Defendant-Appellee Apple Inc. to be

electronically filed with the Clerk of the Court using CM/ECF, which

will automatically send notification of such filing to counsel of record.

By: */s/ Mark S. Davies*
Mark S. Davies
ORRICK, HERRINGTON &
   SUTCLIFFE LLP
1152 15th Street NW
Washington, D.C. 20005
(202) 339-8400
mark.davies@orrick.com

*Counsel for Defendant-Appellee
Apple Inc.*

## CERTIFICATE OF COMPLIANCE
## UNDER FEDERAL RULE OF APPELLATE PROCEDURE
## 32(A)(7) AND FEDERAL CIRCUIT RULE 32

Counsel for Defendant-Appellee Apple Inc. certifies that the brief contained herein has a proportionally spaced 14-point typeface, and contains 13,876 words, based on the "Word Count" feature of Word 2007, including footnotes and endnotes.  Pursuant to Federal Rule of Appellate Procedure 32(a)(7)(B)(iii) and Federal Circuit Rule 32(b), this word count does not include the words contained in the Certificate of Interest, Table of Contents, Table of Authorities, Abbreviations, and Statement of Related Cases.

Dated:      August 12, 2014

By:  */s/ Mark S. Davies*
Mark S. Davies
ORRICK, HERRINGTON &
    SUTCLIFFE LLP
1152 15th Street NW
Washington, D.C. 20005
(202) 339-8400
mark.davies@orrick.com

*Counsel for Defendant-Appellee Apple Inc.*